Matthew SHUKOSKI and Darlene Ritchie, Plaintiffs–Appellants,

v.

INDIANHEAD MOUNTAIN RESORT, INC., Defendant–Appellee.

No. 97–2241.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 26, 1999.

Decided Feb. 4, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied March 25, 1999.

Paul D. Reingold, Michigan Clinical Law Program, Ann Arbor, Michigan, Gordon K. Aaron (argued and briefed), Gordon K. Aaron & Associates, Milwaukee, Wisconsin, for Plaintiffs–Appellants.

Peter L. Dunlap (argued and briefed), Mark A. Bush (briefed), Charyn K. Hain, Fraser, Trebilcock, Davis & Foster, Lansing, Michigan, for Defendant–Appellee.

Robert S. Rosemurgy, Escanaba, Michigan, for Defendant–Subrogee.

Ronald S. Lederman (briefed), Sullivan, Ward, Bone, Tyler & Asher, Southfield, Michigan, for Amicus Curiae.

Before: MERRITT and MOORE, Circuit Judges; DUGGAN, District Judge.*

* The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

## OPINION

MERRITT, Circuit Judge.

Plaintiffs–Appellants Matthew Shukoski and Darlene Ritchie appeal the decision below granting summary judgment in favor of the Defendant–Appellee Indianhead Mountain Resort, Inc., a ski resort in Wakefield, Michigan. On December 30, 1996, Shukoski and Ritchie, his mother and natural guardian during his minority at the time of the events in question, both residents of Wisconsin, filed a diversity action (1) claiming that Shukoski sustained crippling injuries as a result of the resort's negligent design, construction and maintenance of its snowboarding facilities, and (2) alleging that the conditions existing at the location where he sustained his injuries reflected unusual and unnecessary terrain modifications which caused and enhanced those injuries. The instant matter presents the question whether persons engaged in snowboard skiing, as distinguished from alpine and cross-country skiing, are governed by Michigan's Ski Area Safety Act of 1962, Mich. Comp. Laws § 408.321 *et seq.* (1985) ("the Act"), which limits ski operators' liability for personal injury accidents arising out of the inherent risks of skiing.

## BACKGROUND

On March 20, 1994, Plaintiff Matthew Shukoski, then a minor of seventeen years and a guest of his neighbors, the Brook family, was involved in a serious accident while skiing on a snowboard at the ski complex operated by Defendant Indianhead Mountain Resort, Inc. Prior to his accident, Shukoski had been snowboarding for three years and on numerous occasions, including one previous weekend visit to Indianhead. Moreover, Shukoski and his friends, including Chris Brook, often went to local sledding hills in their hometown of New London, Wisconsin, where they created two to three-foot ramps off of which to execute jumps on their snowboards. Shukoski testified that he and his friends fell on occasion while performing these jumps at the local hills and that he knew he could get hurt. Shukoski's accident occurred on the second day of his visit to Indianhead. At the

Indianhead Mountain Resort, snowboard skiers used the same lift ticket, the same slopes, and the same ski lifts as all other skiers. On March 19 and the morning of March 20, 1994, Shukoski and Chris Brook skied on their snowboards on several of Indianhead's trails, all but one of which are open to all skiers, including snowboard skiers.

In addition to its conventional slopes, Indianhead also has a snowboard terrain garden that is reserved exclusively for use by snowboard skiers. This restricted area consists of a downhill slope that has been modified to create ramps, banks, jumps and other features designed to accommodate snowboarders. At the time of Shukoski's injury, the terrain garden was clearly marked at the top of the run with a black diamond, the conventional skiing symbol for expert slopes. Shukoski testified that he recognized the significance of that symbol and that even though he fully understood that he could get hurt, he "felt confident enough to go down [the slope]."

After lunch on March 20, 1994, Shukoski and Chris Brook went to the terrain garden to practice jumps on their snowboards. The terrain garden at the time of Shukoski's accident contained three clearly visible crescent-shaped mounds made of snow. When viewing the trail from the top of the hill, the first mound was to the left side of the trail; the second mound was on the right side of the trail; and the third mound was on the left side. Snowboarders used these mounds either to make turns along the vertical face of the crescents, or, as in the case of Shukoski, to jump over the mounds.

Shukoski testified that he and Brook navigated the garden slope five or six times without incident just prior to the accident. Then, while descending the terrain garden one final time, Shukoski intentionally attempted to execute a jump off one of the mounds as Chris Brook, who had successfully jumped the same mound himself just moments before, watched. While executing the jump, Shukoski's snowboard came out from under him and he landed first on his lower back and then on his upper back. The snow-

board, still attached to his feet, struck the ground last and stopped his forward progress down the slope. Shukoski immediately called out to his friend for help and complained of severe shoulder and neck pain, as well as a loss of feeling in his legs. The Indianhead ski patrol responded to the accident in a timely fashion and Shukoski was rushed to the hospital. As a result of his fall, Shukoski sustained a fracture of his cervical spine and was left a quadriplegic.

Plaintiffs claimed that the outrun of the jump in question—that is, the downward slope of the back side of the jump—was too flat to cushion Shukoski's fall, thereby exacerbating his injuries. In the proceedings below, the parties agreed that the issue of whether Shukoski's claim is precluded by Michigan's Ski Area Safety Act should be decided upon cross-motions for summary judgment. On October 15, 1997, the district court granted Indianhead's motion, denied Shukoski's motion, and found that the Ski Area Safety Act barred Shukoski's personal injury action against the resort. This timely appeal ensued.

## ANALYSIS

■ Michigan's Ski Area Safety Act, Mich. Comp. Laws § 408.342(2) (1985), provides that skiers assume the risk arising from "variations in terrain":

> Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary. Those dangers include, but are not limited to, injuries which can result from variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees and other forms of natural growth or debris; collisions with ski lift towers and their components, with other skiers, or with properly marked or plainly visible snow-making or snow-grooming equipment.

*Id.* The purposes of the Act include, *inter alia,* safety, reduced litigation, and economic stabilization of an industry which contributes substantially to Michigan's economy. Originally promulgated in 1962, the Act was amended in both 1981 and 1995 to clarify the scope of this assumption of risk statute. In

*Grieb v. Alpine Valley Ski Area,* 155 Mich. App. 484, 400 N.W.2d 653 (Mich.App.1986), plaintiff Michelle Grieb was injured when she was struck from behind by an unknown skier while skiing on a slope at defendant Alpine Valley Ski Resort, against which she brought suit for personal injuries resulting from the collision. The Court of Appeals of Michigan affirmed the trial court's grant of accelerated judgment for the defendant on the ground that plaintiff's cause of action against Alpine was precluded under Michigan's Ski Area Safety Act. In so doing, the Michigan court reviewed extensively the legislative history of the Act, stating:

> The Legislature perceived a problem with respect to the inherent dangers of skiing and the need for promoting safety, coupled with the uncertain and potentially enormous ski area operators' liability. Given these competing interests, the Legislature decided to establish rules in order to regulate the ski operators and to set out ski operators' and skiers' responsibilities in the area of safety. As part of this reform, the Legislature has decided that all skiers assume the obvious and necessary dangers of skiing. This is a rational solution for limiting ski area operators' liability and promoting safety.

*Id.* at 655.

Skiing is a risky sport that causes many injuries. In *Schmitz v. Cannonsburg Skiing Corp.,* 170 Mich.App. 692, 428 N.W.2d 742 (Mich.App.1988), the plaintiff's decedent died as a result of injuries incurred when he struck, while downhill skiing, a lone tree growing on a ski slope operated by the defendant. The Court of Appeals of Michigan held that the plaintiff's tort claims of negligence and intentional nuisance were barred under the Ski Area Safety Act. *See id.* The court further observed:

> [T]he list of "obvious and necessary" risks assumed by a skier under the statute involves those things resulting from natural phenomena, such as snow conditions or the terrain itself; natural obstacles, such as trees and rocks; and types of equipment that are inherent parts of a ski area, such as lift towers and other such structures or snowmaking or grooming equipment when

properly marked. These are all conditions that are inherent to the sport of skiing. It is safe to say that, generally, if the "dangers" listed in the statute do not exist, there is no skiing. Therefore, it is logical to construe ... the statute as an assumption of risk clause that renders the reasonableness of the skiers' or the ski area operator's behavior irrelevant. By the mere act of skiing, the skier accepts the risk that he may be injured in a manner described by the statute. The skier must accept these dangers as a matter of law. *Id.* at 744.[1]

■ We hold that snowboard skiers are governed by the assumption of risk provisions of Michigan's Ski Area Safety Act, as amended in 1981. Traditional alpine skiing is the classic form of traversing a slope with two "skis" that have evolved from hardwood boards with one strap to the modern version of the synthetic materials, fixed bindings, and rigid boots. By contrast, snowboard skiers use an oval or elongated rectangular board which is considerably wider than a ski; their feet are held to the board in separate fixed bindings, parallel to one another at a right angle to the snowboard.

In 1995, the Act was amended so as to clarify the definition of a "skier" as:

> a person wearing skis or utilizing a device that attaches to at least 1 foot or the lower torso for the purpose of sliding on a slope. The device slides on the snow or other surface of a slope and is capable of being maneuvered and controlled by the person using the device. Skier includes a person not wearing skis or a skiing device while the person is in a ski area for the purpose of skiing.

Mich. Comp. Laws § 408.322(g) (West 1998). Under this amended definition, snowboard skiers certainly fall under the definition of "skiers" and must therefore assume the in-

herent risks of their activities while at a resort in Michigan. While the 1995 amendments to the Act are irrelevant to this Court's determination of whether Plaintiff Matthew Shukoski's claim is governed by the 1981 version of the Act that was in effect at the time of his accident in 1994, their legislative history lends support to the fact that the Act in effect in 1994 covered snowboard skiing as well as traditional alpine skiing. The Michigan Senate Fiscal Agency's Analysis of Senate Bill 471 (June 29, 1995) pinpointed the erroneously perceived loophole in the Ski Area Safety Act vis-a-vis snowboard skiers:

> It has been pointed out that these provisions *might not* necessarily cover someone using a snowboard (like a skateboard without wheels), or a legless person using a ski-like device attached to the torso. The Act currently defines "skier" as a person wearing skis or a person not wearing skis while in a ski area for the purpose of skiing. On the other hand, the American National Standards Institute (ANSI), which sets standards for ski areas and other industries, defines "skiers" to include people using snowboards and handicappers using ski devices. Apparently, ski areas are inspected both by the Department of Commerce, which relies on the statutory definition, and by insurers, who adhere to the ANSI definition. It has been suggested that the Act be amended to include snowboards and ski devices, in order to conform to the ANSI standards and to *clarify* the responsibility and liability of people using these devices, as well as the liability of ski operators for accidents involving them.

*Id.* (emphases added). The Agency's analysis continued:

> Snowboarding is a sport that is growing in popularity. Reportedly, national statistics show that 15% to 20% of the people who

---

1. Sixteen states have adopted various forms of "inherent danger" statutes. *See* Alaska Stat. § 09.65.135 (1983); CRS §§ 33–44–101 to –114 (West 1996); Idaho Code §§ 6–1101 to –1109; Mass. Gen. Laws Ann. Ch. 143 § 71 H–71S (West 1991); Mich. Comp. Laws § 408.321 to 408.344 (West 1985); Mont.Code Ann. §§ 23–2–732 to –736 (1991); N.H.Rev.Stat. Ann. 225–A:1 to A:26 (1989); N.D. Stat. §§ 53–09–01– to –10; Ohio Rev.Code Ann. §§ 4169.01 to –4169.99 (Baldwin 1990); Ore.Rev.Stat. §§ 30.970 to .990; 42 Pa. Cons.Stat. Ann. § 7102(c) (1988); R.I. Gen. Laws §§ 41–8–2 to –3 (1990); Tenn.Code Ann. §§ 68–48–101 to –107 (1987); Utah Code Ann. §§ 78–27–51 to –54 (1992 & Supp.1994); 12 Vt. Stat. Ann. § 1037 (1991); W. Va.Code §§ 20–3A–1 to 20–3A–8 (1984).

use ski facilities are snowboarders. In addition, skiing by handicappers has increased. Since these individuals share the slopes with skiers regulated under the Ski Area Safety Act, they also should share the same statutory regulations and protections. By including snowboards and ski devices in the Act, the bill would make people using them subject to the Act's provisions governing skiers' conduct, assumption of the risk, and liability for violations. At the same time, the liability and responsibility of ski area operators would be the same for snowboarders and ski device users as it is for traditional skiers. In addition, the Act would be consistent with national safety standards.

*Id.*

As the Defendants argue, the 1995 amendments were designed to ensure that the legislative intent of the 1981 Act to cover more than merely traditional alpine skiers was enforced. Due to the potential argument that only traditional alpine skiers are covered—precisely the argument made by Plaintiff Shukoski—and the specter of numerous lawsuits by snowboard and handicapped skiers, the Michigan Legislature amended the statute to *clarify*, not alter, the responsibility and liability of persons using snowboards and devices for the handicapped, as well as the liability of ski operators for accidents involving such persons. In light of the expressed legislative intent that resulted in the 1995 amendments, it is clear that the amendment was adopted to resolve any possible confusion and to enunciate more clearly the coverage which previously existed for activities such as snowboard skiing.

Moreover, even assuming *arguendo* that the Act had never been so clarified and that this Court could not avail itself of the light shed upon the Act by the legislative history of the 1995 amendments, the Act, as previously amended in 1981, already covered *all* skiers, including snowboard skiers. As first amended, the Act already defined a "skier" as "a person wearing skis, or a person not wearing skis while the person is in a ski area for the purpose of skiing." Mich. Comp. Laws § 408.322(g)(1985). Thus, even before the Act was amended in 1995, even persons who were in the ski area for the purpose of skiing but were not wearing skis were precluded from recovering from ski operators for injuries caused by the inherent risks of skiing. *See id.* Thus, as Defendants note, if a skier walking from the ski lodge to his equipment were to suffer serious injuries from a fall due to icy conditions, he would not be able to recover from the ski resort for his injuries because such a fall is well within the scope of the inherent risks of skiing. The Act prohibits recovery even though the injured party was not actively skiing or even wearing skiing equipment. If the Michigan Legislature intended that persons who are not even wearing their equipment or on the slopes be covered under the Act, it surely intended to cover those using the slopes to participate in activities such as snowboard skiing, which expose the participant to the identical risks as traditional alpine skiing. Any contrary interpretation would destroy the intent of the Ski Area Safety Act.

■ The Act provides that a skier "accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary." Mich. Comp. Laws § 408.342(2) (1985). Such inherent dangers include variations in terrain. *See id.* In the instant matter, Indianhead Resort's snowboard terrain garden, reserved exclusively for use by snowboard skiers and marked clearly as an expert slope with a black diamond, consisted of a downhill slope that had been modified to accommodate snowboarders. At the time of Plaintiff's accident, the terrain garden contained three clearly visible crescent-shaped mounds of snow, which snowboarders could use either to execute turns along the vertical face of the crescents or to jump over them, a far more daring maneuver. Both Matthew Shukoski and his friend chose intentionally to jump the mounds and did so five or six times with success before Shukoski suffered his injuries. Under Michigan law, Shukoski's accident, however tragic, was the result of the inherent risks both of snowboard skiing, *see Schmitz v. Cannonsburg Skiing Corp.,* 170 Mich.App. 692, 428 N.W.2d 742 (Mich. App.1988), and of the terrain which he attempted to navigate, *see* Mich. Comp. Laws

§ 408.342(2) (1998), risks which he intentionally assumed by his own course of action.

Accordingly, we find that Michigan's Ski Area Safety Act precludes any recovery by the Plaintiff for injuries sustained while snowboard skiing on the Defendant's premises and that the lower court properly granted judgment in Defendant's favor as a matter of law. We thus affirm the judgment of the district court.