# STATE OF MICHIGAN

# COURT OF APPEALS

---

DONALD J. RHODA, Guardian/Conservator of
TREVOR RHODA, and TAMMIE WALKER,

        Plaintiffs-Appellants,

v

PETER E. O'DOVERO, INC. d/b/a
MARQUETTE MOUNTAIN,

        Defendant-Appellee.

UNPUBLISHED
March 24, 2016

No. 321363
Marquette Circuit Court
LC No. 13-051044-NI

---

Before: GLEICHER, P.J., and K. F. KELLY and SERVITTO, JJ.

PER CURIAM.

Michigan's Ski Area Safety Act of 1962 (SASA), MCL 408.321 *et seq*., delineates the distinct duties applicable to ski area operators and skiers. Among the responsibilities assigned to operators is an obligation to designate closed runs, slopes or trails in the manner prescribed by Michigan's ski area safety board (SASB). MCL 408.326a(d). Skiers (the statutory term includes snowboarders) must "[h]eed all posted signs and warnings," MCL 408.342(1)(c), and generally assume the risk of "obvious and necessary" dangers that "inhere" in the sport. MCL 408.342(2). Snowboarders or ski operators who disobey their statutory duties are "liable for that portion of the loss or damage resulting from that violation." MCL 408.344. We consider the interplay of these statutory provisions in a case arising from a snowboarder's fall from a defective rail.

Marquette Mountain designed and assembled a special combination snowboard rail for use in a snowboarding competition. The day before the event, Marquette Mountain realized that the rail's separate sections were incompletely welded together. A dangerous gap separated the two parts. Marquette Mountain attempted to prevent snowboarders from accessing the rail by erecting crossed red poles at its top. This form of closure did not conform to the SASB rules, which instead required "a sign containing a regulatory symbol and the word 'closed' in 3-inch or larger letters," plus the placement of a rope, mesh tape, or fence across the top or entrance to a closed run. Mich Admin Code, R 408.82(1).

Trevor Rhoda and other snowboarders rode the defective rail despite the crossed poles. On his last ride, Rhoda's snowboard snagged in the gap and Rhoda fell. His head struck the rail, resulting in a severe brain injury. Rhoda's conservator filed this negligence action against Marquette Mountain alleging that the ski operator failed to properly close the rail and to warn of

-1-

its danger. The trial court granted summary disposition in favor of Marquette Mountain, ruling that the administrative regulations generated by the SASB do not address the method for closing snowboarding rails, and that the crossed poles sufficed to warn Rhoda that he assumed the risk of riding a defective rail.

We hold that the administrative regulations apply to snowboarding runs such as the rail, and that the crossed poles did not comply with the SASB's closure requirements. Because Marquette Mountain violated its duties by relying on the poles to warn snowboarders of the rail's dangers, it bears liability for Rhoda's damages attributable to that violation. Although a jury may find Rhoda comparatively negligent for failing to "heed" the crossed poles, Marquette Mountain may not avoid liability based on Rhoda's decision to snowboard, as a defective and dangerous rail is not a danger that necessarily inheres in the sport. We reverse and remand for further proceedings.

I

Trevor Rhoda was an experienced and accomplished snowboarder. On a relatively warm day in April 2010, Rhoda and several friends practiced their snowboarding skills at Marquette Mountain to prepare for the Mountain's upcoming Super Park Competition. Marquette Mountain featured a terrain park for snowboarders, and had designed and erected a special combination rail in anticipation of the next day's special snowboarding event.

In the snowboarding world, a rail is a long metal piece of pipe that may be flat, straight, or curved. "What are the Types of Rails for Snowboards?" <https://www.trails.com/list_5130_what-types-rails-snowboards.html> (accessed March 22, 2016). Snowboarders slide their boards along the tops of rails to perform tricks or special moves. The longer the rail, the more difficult it is to maneuver. *Id*.

Dave Silverstein, a Marquette Mountain employee, testified that he and another employee constructed the combination rail by placing two snowboarding rails together to create "a bigger rail" than normal. The first segment of the special rail went down, then flat, then down. The second section was flat and then sloped down. When the ski area opened on April 2, 2010, the two component rails had not yet been welded together. Silverstein anticipated that the rail would be closed to snowboarders' use until the two segments were attached, as lacking a joining weld, the rail was "hazardous."

Ski Patroller Andrew Bek, another Marquette Mountain employee, inspected the combination rail before the ski area opened on April 2. He noted that the rail "wasn't complete; it wasn't ready for people to ride on." Bek recounted that "[t]he thing wasn't completely affixed to the surface of the snow. It was a two-part feature, and it wasn't fastened, and so that right away says that's not safe." According to Bek, there was "an inch or two" gap between the two rail sections. Bek decided to close the rail. He explained that when he encountered a danger at Marquette Mountain, he closed-off access to the danger and advised the company.

> *Q.* . . . If there was a hazard that was, let's say, a tree laying across the trail, I'd close the trail, let them know about it, and then whenever they can go

move that tree, then it's up to them.  My job is to close the trail or, in this case, close the feature.

> *A.*	A tree lying in a trail generally isn't going to cover a whole hill; correct?
>
> *Q.*	Right.
>
> *A.*	But you close down the whole hill if there's a tree that's laying down in a - - on one of the runs?
>
> *Q.*	If I think that it's something that a guest could run into inadvertently, then, yeah, I'd close that whole run.  If it's a hazard that's you know, discretely in one place, then I would mark that place.  It depends on the situation.

Bek drilled two pilot holes in the snow and placed red bamboo poles into them in an "X" formation "[a]t the approach ramp . . . across the front or the uphill side of that where a person would approach that terrain feature."  An eyewitness to Rhoda's accident testified that when Rhoda slid onto the rail, only one bamboo pole was evident.

Rhoda approached the rail on his snowboard from the side, rather than the front.  Other snowboarders also accessed the combination rail from the sides, via approaches known as "urban lips."  As best we can discern from the record, "urban lips" are snow formations that allow a snowboarder to access a rail from the sides rather than the top.  Silverstein admitted that he and another Marquette Mountain employee designed the combination rail to offer "urban style access, which means you had to jump onto the rail instead of ride on."  The Marquette Mountain employees had "pushed snow" creating "urban lips" on both sides of the rail.  Rhoda jumped onto the rail from the right side, turned around to face backwards, and slid backwards down the rail.  Bek described the next events as follows:

> *A.*	It looked like his weight and momentum separated the rails further than they were, and then his board went between them in the gap, that his weight and momentum widened and his board got trapped there.
>
> *Q.*	His board was sliding down backwards got caught in the separation between the two components of the rail?
>
> *A.*	Correct.
>
> *Q.*	And at that point he swung back, and did he strike his head on the rail?
>
> *A.*	Yes.
>
> *Q.*	Did you see the rails kicking out one way or another as the - -

*A.*     I don't remember that happening.  I was watching the guest at that point.

*Q.*     So the thing that sticks out in your mind is that his board got caught in the separation?

\* \* \*

*A.*     Yes.

Rhoda suffered a severe brain injury as a result.

Marquette Mountain's general manager, Vern Barber, admitted at deposition that the combination rail "was dangerous because it was not yet welded."  Had the rail been welded, it may also have been hazardous because it was loose, Barber explained, "[b]ut the two-rail component and the separation of the fact that they move made it the dangerous part."  During the evening after Rhoda's accident, a Marquette Mountain employee welded the two rails together.

Rhoda's conservator filed suit against Marquette Mountain.  His complaint alleged that the Mountain negligently failed to assemble the rail and to "adequately mark, cordon off, or post the rail as off limits."  Marquette Mountain moved for summary disposition under MCR 2.116(C)(10), asserting that the rail's hazardous condition was open and obvious and that the crossed bamboo poles had closed the feature.  The Mountain contended that Rhoda violated the SASA by disregarding the crossed poles.  "When a snowboarder chooses to go on obviously dangerous terrain," Marquette Mountain argued, "he intentionally assumes the risks of that terrain.  The SASA precludes any recovery by a snowboarder who intentionally assumes the risks of dangerous terrain by snowboarding on that terrain."  (Citations omitted.)

Rhoda responded that the SASA protects ski area operators from liability for injuries stemming from dangers that inhere in the sports of skiing and snowboarding only to the extent that the dangers are both "obvious and necessary."  MCL 408.342(2).  The danger presented by the unwelded rail was neither necessary nor obvious, Rhoda insisted, precluding application of the SASA.  Further, Rhoda argued, Marquette Mountain had not properly closed the hazardous rail; it merely erected crossed poles, but the administrative rules promulgated by the SASB required a physical barrier.

The trial court granted Marquette Mountain's motion, finding that although "a broken or faulty rail is not something inherent or necessary to the sport" of snowboarding, the crossed bamboo poles sufficed to close the rail.  The court explained that while "the statute and administrative regulations" direct ski area operators how to close ski runs or trails, "[t]here are no such standards for closing snowboarding runs or rails."  Absent any applicable rules, the court determined, "the use of the red 'X' was a 'proper' method of closure; and the red 'X' was 'plainly visible' to the Plaintiff."  Accordingly, the court concluded, "the closed rail was a properly marked hazard and, it was within the risks assumed by the Plaintiff."

Rhoda now appeals.

## II

"We review de novo a circuit court's summary disposition ruling." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). We also review de novo the application and interpretation of a statute. *Hunter v Hunter*, 484 Mich 247, 257; 771 NW2d 694 (2009). In interpreting a statute, "[t]he first step . . . is to examine its plain language, which provides the most reliable evidence of intent." *Ter Beek v City of Wyoming*, 495 Mich 1, 8; 846 NW2d 531 (2014).

> We give the words of a statute their plain and ordinary meaning, looking outside the statute to ascertain the Legislature's intent only if the statutory language is ambiguous. Where the language is unambiguous, "we presume that the Legislature intended the meaning clearly expressed—no further judicial construction is required or permitted, and the statute must be enforced as written." [*Bloomfield Charter Twp v Oakland Co Clerk*, 253 Mich App 1, 10; 654 NW2d 610 (2002), overruled in part on other grounds *Stand Up for Democracy v Secretary of State*, 492 Mich 588; 822 NW2d 159 (2012), quoting *Pohutski v City of Allen Park*, 465 Mich 675, 683; 641 NW2d 219 (2002).]

When discerning legislative intent, we read the entire act and interpret a particular word in one statutory section only "after due consideration of every other section so as to produce, if possible, a harmonious and consistent enactment as a whole." *Grand Rapids v Crocker*, 219 Mich 178, 182-183; 189 NW 221 (1922). In construing the SASA, we must "presume that every word has meaning and avoid a construction which would render a statute, or any part of it, surplusage or nugatory." *Frank v William A Kibbe & Assoc, Inc*, 208 Mich App 346, 350-351; 527 NW2d 82 (1995).

## III

We start with the statute. The SASA imposes certain specific duties on skiers[1] and other specific duties on ski area operators. The duties borne by ski area operators include those listed in MCL 408.326a, which provides in relevant part:

> Each ski area operator shall, with respect to operation of a ski area, do all of the following:

* * *

---

[1] The SASA broadly defines "skier" as a "person wearing skis or utilizing a device that attaches to at least 1 foot or the lower torso for the purpose of sliding on a slope." MCL 408.322(g). This definition encompasses snowboarders. See *Barrett v Mount Brighton, Inc*, 474 Mich 1087; 712 NW2d 154 (2006). Our Legislature amended the SASA in 1995 to include snowboarders within the definition of skiers. For a detailed and thorough explanation of the legislative history of this amendment, see *Shukoski v Indianhead Mountain Resort, Inc*, 166 F3d 848, 851-852 (CA 6, 1999).

(d) *Mark the top of or entrance to each ski run, slope, and trail which is closed to skiing, with an appropriate symbol indicating that the run, slope, or trail is closed, as prescribed by rules promulgated under [MCL 408.340(3)].* [Emphasis added.]

MCL 408.342 sets forth the duties a skier must fulfill:

(1) While in a ski area, each skier shall do all of the following:

(a) Maintain reasonable control of his or her speed and course at all times.

(b) Stay clear of snow-grooming vehicles and equipment in the ski area.

(c) *Heed all posted signs and warnings*.

(d) Ski only in ski areas which are marked as open for skiing on the trail board described in [MCL 408.326a(e)]. [Emphasis added.]

The SASA provides that if a skier or a ski-operator violates the duties defined in the Act, the skier or operator "shall be liable for that portion of the loss or damage resulting from that violation." MCL 408.344. "The Legislature's use of the word 'shall' in a statute generally 'indicates a mandatory and imperative directive.' " *Costa v Cmty Emergency Med Services, Inc*, 475 Mich 403, 409; 716 NW2d 236 (2006), quoting *Burton v Reed City Hosp Corp*, 471 Mich 745, 752; 691 NW2d 424 (2005)..

In addition to establishing duties of care, the SASA provides that skiers and snowboarders assume a risk of injury arising from certain dangers that inhere in the sport:

Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary. Those dangers include, but are not limited to, injuries which can result from variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees, and other forms of natural growth or debris; collisions with ski lift towers and their components, with other skiers, or with properly marked or plainly visible snow-making or snow-grooming equipment. [MCL 408.432(2).]

In *Anderson v Pine Knob Ski Resort, Inc*, 469 Mich 20, 24; 664 NW2d 756 (2003), the Supreme Court explained that "by skiing, skiers are held to have accepted certain types of risks from dangers that inhere in the sport as long as those dangers are 'obvious and necessary.' " MCL 408.432(2), *Anderson* explained, "identifies two types of dangers inherent in the sport." *Id*. The first are "natural hazards," and the second are "unnatural hazards," such as " 'collisions with ski lift towers and their components, with other skiers, or with properly marked or plainly visible snow-making or snow grooming equipment.' " *Id*. at 24-25, quoting MCL 408.342(2). The examples of assumed hazards mentioned in the statue "all inhere in the sport of skiing and, as long as they are obvious and necessary to the sport, there is immunity from suit." *Id*. at 25.

Our consideration of Rhoda's legal arguments begins with MCL 408.326a(d), which requires that ski area operators "mark the top of or entrance to each ski run, slope, and trail which is closed to skiing, with an appropriate symbol indicating that the run, slope, or trail is closed, as prescribed by rules promulgated under [MCL 408.340(3)]." MCL 408.340(3) directs the SASB to promulgate rules "consistent with this act to implement this act . . . ." The trial court ruled that the regulations published by the SASB do not apply to the closure of a single snowboarding "rail or feature." We do not agree with that interpretation of either the SASA or the applicable administrative rule.

The SASA imposes specific obligations on ski operators concerning the closure of ski runs. A ski operator must "mark" a run as closed with a symbol deemed appropriate by the SASB. The "symbol" must be located in a specific place: "the top of or entrance to" the closed "run, slope and trail." The closure method must also conform to the rules generated by the safety board. MCL 408.326a(d). MCL 408.326 empowers the SASB to "promulgate rules for the safe construction, installation, repair, use, operation, maintenance, and inspection of all ski areas consistent with this act to implement this act . . . ." These two statutory sections place mandatory and affirmative duties on ski operators and the SASB regarding closures. The statute charges ski operators with a responsibility to warn skiers of closed runs in the particular manner specified by the SASB.[2] Not any method of closure will do; the board's determination of proper closure mechanics must control.

In accord with these legislative commands, the board promulgated Mich Admin Code, R 408.82, which provides:

> (1) When a ski area is open for skiing and any ski run, slope, or trail is closed to skiing, the ski area operator shall mark the top of, or entrance to, each closed run, slope, or trail with a sign containing a regulatory symbol and the word "closed" in 3-inch or larger letters. The ski area operator shall place a fiber rope with flags, or mesh tape that is more than 3 inches in height, or a fence across the top of, or entrance to, the run, slope, or trail that is closed. The ski area operator shall place the flags on a fiber rope not more than 10 feet apart.

> (2) As used in this rule, "regulatory symbol" means a circle or octagon that has contrasting colors around an image of a prohibited activity overlaid with a diagonal line. The ski area operator shall ensure that the inside height and width of the circle or octagon are not less than 6 inches.

---

[2] The board consists of seven members: three ski area managers, one engineer with skiing experience, one member of the central United States ski association, one person with skiing experience from the Upper Peninsula representing the general public, and one person with skiing experience from the Lower Peninsula representing the general public. MCL 408.323.

We must interpret this provision within its statutory context. The 1995 amendments to the SASA reflect the Legislature's intent that all provisions of the Act apply equally to snowboarding as well as skiing. Against this backdrop, we believe that the plain, common meaning of the terms "ski run, slope, or trail" includes snowboarding runs, with or without rails. Relevant caselaw supports our conclusion.

*Barrett v Mt Brighton, Inc, (On Remand)*, unpublished opinion per curiam of the Court of Appeals, issued June 3, 2004 (Docket No 222777), involved a skier's collision with a snowboarding rail. The rail "was located in a skiing area intended for use exclusively by snowboarders[.]" *Id.* at 1. One of the issues presented was whether the rail constituted "an inherent danger to the sport of skiing" and therefore a risk assumed by the plaintiff in that case. The majority found the rail unnecessary to the sport of downhill skiing, and thus not within the risks assumed by a skier as opposed to a snowboarder. The majority further concluded that the defendant violated the SASA by failing to post signs warning skiers of the difficulty they would face by skiing in the snowboard area. *Id.* at 5.

Judge, now Justice, Zahra dissented, opining that "because a snowboard rail is obvious and necessary to snowboarding, it is a hazard that inheres in the sport of skiing under MCL 408.342(2)." *Barrett v Mt Brighton, Inc*, unpublished opinion per curiam of the Court of Appeals, issued June 3, 2004 (Docket No. 222777) (ZAHRA, J., dissenting), unpub op at 2. Further, Justice Zahra argued, nothing in the SASA required the defendant "to post signs indicating that certain ski runs or trails are only meant for certain types of skiers, such as snowboarders," and no evidence supported that the "defendant would have stayed off the snowboard run had he known its degree of difficulty." *Id.* The Supreme Court reversed, quoting in full Justice Zahra's statement regarding the "snowboard run." *Barrett*, 474 Mich 1087.

We cite *Barrett* for the simple and obvious proposition that the term "ski run" used in MCL 408.326a(d) equally applies to snowboard runs. That a particular snowboard run involves a rail, a half-pipe, or some other man-made feature makes no logical difference. Although the SASA does not define the terms "run," "slope" or "trail," the plain, ordinary and common meanings of these terms encompass the paths a skier or snowboarder takes to get down a hill, including those paths designed and constructed by the ski operator for precisely that purpose. MCL 408.326 mandates that the SASB "promulgate rules for the safe construction, installation, repair, use, operation, maintenance, and inspection of *all* ski areas and ski lifts as the board finds necessary for protection of the general public while using ski areas and ski lifts." (Emphasis added.) Ski areas are defined as "an area used for skiing and served by 1 or more ski lifts." MCL 408.322(f). Read in its entirety, we find nothing in the broad language of the Act suggesting that the Legislature intended that a snowboarding feature such as a rail would remain unregulated by the SASB.[3]

---

[3] We note that Vernon Barber, Marquette Mountain's general manager, testified at deposition regarding the signage used on April 2, 2010. During his deposition, he repeatedly referred to the terrain park areas containing the rails as "runs."

The two red poles in an "X" formation placed at the top of the defective rail did not suffice to close that run. As previously indicated, Mich Admin Code, R 408.82 specifies that a trail, slope or run must be closed by "a sign containing a regulatory symbol and the word 'closed' in 3-inch or larger letters." Further, "[t]he ski area operator shall place a fiber rope with flags, or mesh tape that is more than 3 inches in height, or a fence across the top of, or entrance to, the run, slope, or trail that is closed." *Id.* The trial court erred by concluding as a matter of law that the poles adequately informed Rhoda of the risks presented by the rail. To the contrary, Marquette Mountain violated its statutory obligations by failing to close the rail in the manner prescribed by Mich Admin Code, R 408.82.

Marquette Mountain asserts that a "terrain park guide" published by the National Ski Areas Association (NSAA) indicates that crossed poles may serve to close a terrain park feature, such as a rail. An expert's affidavit submitted by the Mountain avers that crossed bamboo poles comply with the industry standard in blocking off a terrain park feature. The NSAA guide does not have the force or effect of law, unlike the ski board regulations, and therefore must yield to the SASB rules. Compliance with the NSAA guide does not absolve a ski operator from its obligations under the SASA or the regulations promulgated pursuant to the Act.

A ski operator that violates a duty defined in the SASA "shall be liable for that portion of the loss or damage resulting from that violation." MCL 408.344. The evidence supports such a violation here. We next consider whether Rhoda bears liability for his injuries.

V

Marquette Mountain contends that regardless of whether it closed the defective rail in conformity with the safety board rules, Rhoda assumed the risk of injury by snowboarding on it and therefore may not pursue a negligence claim. According to this argument, the SASA's assumption-of-risk provision trumps the statutory duties applicable to ski operators, as well as the Act's final provision providing for liability against any snowboarder or ski operator who "violates this act." MCL 408.344. This Court soundly rejected Marquette Mountain's argument in *Rusnak v Walker*, 273 Mich App 299; 729 NW2d 542 (2006). Guided by *Rusnak*, we hold that even had Rhoda's fall resulted from an obvious and necessary risk inherent in the sport of snowboarding, he would nevertheless be eligible to recover damages to the extent that Marquette Mountain's violation of the SASA caused his injury.

The plaintiff in *Rusnak* was injured in a collision with another skier. As the downhill skier, the plaintiff asserted that she had the right of way on the slope, and that the defendant had recklessly skied into her. *Id*. at 302. The trial court granted summary disposition in the defendant's favor, and this Court affirmed because it felt obligated to do so by previous caselaw. *Id*. at 301. However, the original *Rusnak* panel expressed disagreement with the prior binding cases, and this Court ultimately convened a conflict panel pursuant to MCR 7.215(J).

The conflict panel carefully elucidated the sections of the SASA setting forth the duties of skiers, the assumption-of-risk provision, and the directive that violators of the Act may be held liable for the damages they cause. *Id*. at 303-305. The Court observed that the SASA's assumption-of-risk language clearly contemplated that "collisions with other skiers are an obvious and necessary danger that inheres in the sport and that the skier has assumed the risk of

-9-

being injured by such a danger." *Id*. at 304.[4]  But because the plaintiff established that the defendant may have violated his duties to ski responsibly as set forth in MCL 408.341(1), the defendant could still bear liability "for that portion of the loss or damage resulting from that violation." *Id*. at 305, quoting MCL 408.344.  Although the SASA's assumption-of-risk provision is "clear and unambiguous," the *Rusnak* panel declared, it could not be enforced "in such a way that it renders meaningless another equally applicable section." *Id*. at 307-308. Rather, the defendant's acts "would be relevant for a comparative negligence evaluation[.]" *Id.* at 311.

*Rusnak* controls the outcome here.  Although we reject Marquette Mountain's argument that Rhoda assumed the risk of riding a defective rail, a contrary conclusion would not help the Mountain.  As *Rusnak* holds, and the statutory language provides, the Legislature did not intend that ski operators would enjoy absolute immunity when they violate a statutory duty.  Rather, as the conflict panel pointed out in *Rusnak*, an injury caused by a violation of the Act is not an assumed risk barring recovery. *Id.* at 307.  Even were we to find that Rhoda assumed the risk of snowboarding on a defective rail, Marquette Mountain would remain responsible for its proportionate share of the fault for Rhoda's damages.  To hold otherwise would nullify the duty provisions of the statute as well as MCL 408.344.

As we discuss in the next section of this opinion, the assumption-of-risk doctrine does not apply to this case.  However, to the extent that defendant establishes that Rhoda violated any duties under the SASA, Rhoda may be held liable for the share of his damages he caused.  Thus, a jury must weigh Marquette Mountain's violation of its duty to properly mark the closed rail against Rhoda's negligence, if any, in failing to recognize or appreciate the danger posed by the defective rail.

VI

In MCL 408.342(2), the Legislature assigned to snowboarders the risks posed by dangers that "inhere" in that sport—but only to the extent that the dangers are both "obvious" *and* "necessary."  Because the gap in the snowboarding rail was not "necessary," did not "inhere" in the sport, and substantially altered the risks that Rhoda faced when he engaged in snowboarding, the SASA's assumption-of-risk provision does not apply in this case.

The SASA provides in relevant part:

Each person who participates in the sport of skiing accepts the dangers that inhere in that sport insofar as the dangers are obvious and necessary.  Those dangers include, but are not limited to, injuries which can result from variations in terrain; surface or subsurface snow or ice conditions; bare spots; rocks, trees, and other forms of natural growth or debris; collisions with ski lift towers and their

---

[4] As discussed in greater detail in section VI, the "collisions with other skiers" language in MCL 408.324(2) creates a fundamental distinction between this case and *Rusnak*.

-10-

components, with other skiers, or with properly marked or plainly visible snow-making or snow-grooming equipment. [MCL 408.342(2).]

This language clearly and unambiguously provides that snowboarders must bear some, but not all, risks involved in the sport. Specifically, the Legislature determined that a snowboarder is barred from recovery for injuries arising from risks that are "obvious and necessary" and that "inhere" in the sport. We need not decide whether the gap in the unwelded combination rail was "obvious," as the conjunctive term "and" signals that the Legislature intended that a snowboarder would be precluded from suit only when a danger qualifies as *both* "obvious" and "necessary." See *Skybolt Partnership v City of Flint*, 205 Mich App 597, 602; 517 NW2d 838 (1994). Here, the defective combination rail was not a "necessary" danger of snowboarding, and so the assumption-of-risk doctrine does not apply.

The Supreme Court observed in *Anderson*, 469 Mich at 24, that skiers accept two varieties of "obvious and necessary" risks: natural hazards such as rocks and trees, and "unnatural hazards" that include but are not limited to ski lift towers, other skiers, and "*properly marked* or plainly visible snow-making or snow grooming equipment." *Id*. at 24-25 (emphasis added). The examples of assumed hazards mentioned in the statute "all inhere in the sport of skiing and, as long as they are obvious and necessary to the sport, there is immunity from suit." *Id*. at 25.

The Legislature's inclusion of the words "properly marked or plainly visible" as modifiers of the "unnatural hazards" mentioned in the statute was neither accidental nor inconsequential. The import of these words is considerable in the context of this case. *Improperly* marked hazards plainly do not fall within the ambit of the assumption-of-risk provision.

In *Anderson*, the Court found that a skier's collision with a timing shack located on a ski run was a hazard that "inheres in the sport of skiing," and a danger that skiers such as the plaintiff in that case accepted as a matter of law. The Court rejected the plaintiff's argument that the shack "was larger and more unforgiving than other imaginable, alternative timing-equipment protection might have been." *Id*. at 26. Rather, the Court held, "[o]nce hazards fall within the covered category, only if they are unnecessary or not obvious is the ski operator liable." *Id*. The shack was obvious—it need not have been marked—and necessary, in that the timing equipment critical to a ski race must be "protected from the elements." *Id* at 25.

The danger confronted by Rhoda was an unwelded, noncontiguous snowboarding rail. Marquette Mountain's personnel admitted during their depositions that the rail posed a danger. As we have discussed, the rail was not properly marked as being closed to use. For these reasons alone, the rail does not qualify as one of the "unnatural hazards" which create risks that a snowboarder must assume. Furthermore, no evidence supports that the danger presented by the defective rail *necessarily inheres* in the sport of snowboarding.

The SASA lacks a definition of the term "necessary." A common and natural definition of the word "necessary" refers something that is "absolutely needed," "required," "of an inevitable nature" or "that cannot be denied without contradiction." *Merriam-Webster's Collegiate Dictionary* (11th ed, 2014), p 828. An intact and functional snowboarding rail

certainly falls within the realm of "necessary" features at a ski resort, just as the Supreme Court held in *Barrett*, 474 Mich at 1087. And according to the SASA, a snowboarder riding a rail assumes the ordinary risks presented by that activity, just as a skier assumes the risks of traversing moguls or avoiding timing shacks. The danger involved here, however, arose from Marquette Mountain's failure to weld the two segments of the rail together, thereby creating a new and different hazard that unnecessarily increased the risks of riding a snowboarding rail. Simply put, the gap was not a necessary danger. Accordingly, this case does not come within the ambit of the SASA's assumption-of-risk clause.

Further, a snowboarder's use of defective equipment is not an activity that "inheres" in the sport of snowboarding. The assumption-of-risk doctrine embodied in MCL 408.342(2) posits that snowboarders accept those risks that are intrinsic to the sport. By participating, a snowboarder impliedly consents to those risks. When a guest consents to snowboard at a ski area, the guest impliedly relieves the ski operator of any duty to remove all rocks, to erect guards around timing shacks, or to eliminate out-of-control skiers. Snowboarders must anticipate such dangers when they strap on their equipment, and they agree to do so simply by participating. Not so a defective rail. Marquette Mountain makes no credible argument—and we cannot conceive of one—supporting the notion that a dangerous and defective rail qualifies as a risk that inheres in the sport of snowboarding.

In this sense, the rail differs meaningfully from the risk confronted by the plaintiff in *Rusnak*. In that case, the plaintiff was injured by a reckless skier. MCL 408.342(2) provides that collisions "with other skiers" fall within the zone of assumed risks. Although snowboarding rails are not specifically mentioned in the statute, the risks assumed by snowboarding in § 342(2) include hazards of the "same kind, class, character, or nature as those specifically enumerated." *Anderson,* 469 Mich at 25 n 1 (quotation marks and citation omitted). A dangerous condition that a ski operator knows must be closed to public use does not fall within the risks that the Legislature intended a snowboarder to assume. An unfinished, dangerous rail is not of the "same kind, class, character, or nature" as other man-made hazards, which convey simply by their presence the danger that accompanies them.

Because the gap in the rail was neither "necessary" nor a hazard that inhered in the sport, Rhoda did not assume the risk of riding the defective rail. On remand, Rhoda's comparative negligence in using the rail despite the crossed poles may be raised as a defense. However, Marquette Mountain may not attempt to avoid all liability under the doctrine of assumption-of-risk.

VII

Marquette Mountain contends that the gap in the rail was "open and obvious" in that it was visible to other skiers and snowboarders from the vantage point of a chairlift. To the extent that Marquette Mountain seeks to apply the open and obvious danger doctrine of common-law premises liability, we reject that effort. The SASA sets forth specific statutory duties which the common law cannot overcome. See *Jones v Enertel, Inc*, 467 Mich 266, 270; 650 NW2d 334 (2002). See also *Pierce v City of Lansing*, 265 Mich App 174; 694 NW2d 65 (2005); *O'Donnell v Garasic*, 259 Mich App 569; 676 NW2d 213 (2003).

VIII

Finally, Marquette Mountain asserts that Rhoda was intoxicated when he rode the defective rail and that his intoxication serves as an absolute defense pursuant to MCL 600.2955a. The Mountain takes issue with the trial court's failure to grant summary disposition on this ground. The trial court determined that "insufficient evidence" supported that Rhoda's accident resulted from "an impaired ability to function due to the influence of intoxicating liquor[.]" *Id*. We agree with the trial court's conclusion that fact questions regarding both Rhoda's impaired ability to function and whether he was more than 50% the cause of the accident render summary disposition inappropriate.

We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Deborah A. Servitto